**THE STATE OF NEW HAMPSHIRE**

**SUPREME COURT**

**In Case No. 2015-0354, <u>Appeal of Theresa Young</u>, the court on February 18, 2016, issued the following order:**

Having considered the briefs and record submitted on appeal, we conclude that oral argument is unnecessary in this case.  <u>See</u> <u>Sup. Ct. R.</u> 18(1).  We affirm.

The petitioner, Theresa Young, the former finance director for Rockingham County (county), appeals a decision of the county's personnel committee (committee) upholding her seven-day suspension, with pay, by the county's board of commissioners (board).  <u>See</u> RSA 28:10-a (Supp. 2015).  She argues that the evidence did not support findings that she engaged in actionable misconduct for purposes of RSA 28:10-a.  She further argues that the committee erroneously applied the "good cause" standard of RSA 28:10-a, III.  We assume, without deciding, that this appeal is not moot.

RSA chapter 541 governs our review of the committee's decision.  RSA 28:10-a, III; <u>see</u> <u>Appeal of Strafford County Com'rs</u>, 125 N.H. 287, 288 (1984).  Under RSA 541:13 (2007), we will not set aside the committee's order except for errors of law, unless we are satisfied, by a clear preponderance of the evidence, that it is unjust or unreasonable.  The committee's findings of fact are presumed <u>prima</u> <u>facie</u> lawful and reasonable.  RSA 541:13.  In reviewing the committee's findings, our task is not to determine whether we would have found differently or to re-weigh the evidence, but rather, to determine whether the findings are supported by competent evidence in the record.  <u>See</u> <u>In the Matter of Bloomfield</u>, 166 N.H. 475, 478 (2014).  We review the committee's rulings on issues of law <u>de novo</u>.  <u>See</u> <u>id</u>.

We first address whether competent evidence supports findings that the petitioner engaged in actionable misconduct.  RSA 28:10-a, II limits the circumstances under which county commissioners may discharge, remove, or suspend a county employee who has been employed for at least one year to certain enumerated grounds.  An employee so disciplined may appeal to the county's personnel committee, which must uphold the discipline if it "finds good cause" for it.  RSA 28:10-a, III.

In this case, the committee upheld the board's findings that the petitioner engaged in the following courses of conduct, each of which the board determined warranted her suspension: (1) she refused to follow the board's instructions to process a payment to a prior county employee; and (2) she failed to timely apprise

the board of information regarding a New Hampshire Department of Labor (DOL) audit. The first course of conduct, the board found, constituted "neglect of duty," "willful insubordination," and "lack of cooperation," three grounds for suspending an employee under RSA 28:10-a, II. The second course of conduct, according to the board, amounted to "neglect of duty" and "lack of cooperation." On appeal, the petitioner does not argue that the conduct in which the board found that she had engaged could never satisfy the statutory grounds for discipline. Instead, she argues that she did not engage in such misconduct under the circumstances of this case. Accordingly, we examine the record to determine whether competent evidence supports findings that she engaged in the misconduct.

The first finding that the board relied upon to suspend the petitioner was that she refused to abide by its instructions to process a payment. The evidence in the record establishes that on January 22, 2015, the board unanimously approved a separation agreement with a county employee, which was effective on that date. The agreement obligated the county to make two payments – a payment of two weeks' wages (wages payment), and a payment of "separation pay." The agreement also gave the departing employee the right to revoke the agreement within seven days of executing it, and provided that the two payments would be made on the next available "regular Employer payroll" after the departing employee had executed the agreement and the revocation period had expired. Additionally, the board unanimously approved an "exception request," authorizing the wages payment to be made as part of the January 29, 2015 payroll; the petitioner was responsible for processing the wages payment.

On Friday, January 23, 2015, the petitioner sent an e-mail to the board, noting that although the exception request provided for the wages payment to be part of the January 29 payroll, the agreement appeared to require that it be made after January 29. She requested clarification "so that we can process the payroll correctly this upcoming Monday." The vice chair of the board, Kevin Coyle, responded, copying the entire board on his response, by stating that the departing "employee should be paid the [wages payment] this payroll. The remaining money's will be paid later." Later that same day, the petitioner sent the board another e-mail explaining that, because the revocation provision appeared to give the departing employee a right to revoke after January 29, she believed that the agreement required that the departing employee be paid the wages payment on the next payday after January 29. Coyle replied, again copying the entire board, "We expect [the departing employee] to be paid this payroll as normal, then" to be paid the separation pay on the next payday.

On Saturday, January 24, 2015, the petitioner sent another e-mail to the board, stating that although she "underst[oo]d and want[ed] to pay the amount on the payment date [the board] desire[d]," she did not "have authorization from the board" to pay the departing employee on January 29. She suggested that the board vote at its next meeting to authorize a payment on Friday, January 30, 2015, the date she believed the revocation period under the agreement would

2

expire. The chair of the board, Thomas Tombarello, responded, without copying the board, by asking whether the petitioner wanted him "to get a vote," to which she responded affirmatively. Tombarello then sent the petitioner a second e-mail, again without copying the board, stating that "[t]he three commissioner[s] want [the departing employee] paid," and that "we will deal with the rest." Later that day, Coyle sent the petitioner an e-mail, again copied to the entire board, stating that "[y]ou have been authorized by myself and commissioner Tombarello, please do as we asked and stop making it more than it has to be."

The board next met on Wednesday, January 28, 2015; approval of the January 29 payroll was an agenda item. The board learned at the meeting that the petitioner had not included the wages payment in the payroll. The petitioner testified that, based upon her communications with Tombarello on the prior Saturday, she thought that the board would be voting to authorize the payment at the meeting. She further testified that a text message she had received from Tombarello on Monday, January 26, 2015, that his hope was that the departing employee would be "paid on or before Friday," confirmed her belief that the board would vote on Wednesday to authorize a separate Friday payment. Finally, the petitioner testified that she had consulted with the county's outside counsel on the morning of January 28, and that based upon that consultation, she had suggested to Tombarello that the county could issue the wages payment check on January 29 as "a whole separate [payroll] run by itself out of the ordinary," and mail the check at the end of the day on Friday. However, she also conceded that by the end of the prior weekend, she understood that the board wanted the wages payment to be "paid in the first run of the [January 29] payroll."

In suspending the petitioner, the board unanimously found that she had "refused" and "deliberately failed to follow the Board's instructions" to process the wages payment as part of the regular payroll of January 29, 2015. On appeal, she argues that the committee erred by upholding those findings because it "failed to consider her reasons and motives for acting as she did when faced with unclear and conflicting instructions from the Commissioners." Thus, the petitioner asserts that it was unjust, unreasonable, and unlawful for the committee to find that her "intentions and actions . . . amount[ed] to neglect of duty, failure to cooperate and willful insubordination." We disagree.

Coyle sent the petitioner three separate e-mails, each copied to the entire board, directing her to process the wages payment as part of the January 29 payroll. Coyle's final e-mail, after the petitioner's unilateral discussions with Tombarello concerning a board vote to authorize a January 30 payment, unequivocally told her that both he and Tombarello had authorized the wages payment, and directed her to proceed as she had been instructed. Indeed, the petitioner conceded that, by the end of that weekend, she knew that the board wanted the wages payment to be "paid in the first run of the [January 29] payroll." We conclude that competent evidence in the record reasonably supports findings that the petitioner engaged in neglect of duty, willful insubordination,

3

and lack of cooperation for purposes of RSA 28:10-a, II by refusing and failing to follow the board's instructions to process the wages payment.

The second finding that the board relied upon to suspend the petitioner was that she failed to timely apprise it of important information regarding the DOL audit. Evidence in the record establishes that the DOL was conducting an audit of the county throughout much of 2014, and that the petitioner was tasked with providing the DOL with information in connection with the audit. Although the board was generally aware of the audit, it found that the petitioner had not timely advised it that: (1) the DOL had issued a preliminary report to the petitioner on October 31, 2014; (2) the DOL had proposed civil penalties of $17,900, and had provided options for resolving those penalties, in correspondence to the petitioner dated December 5, 2014; and (3) the petitioner would be attending an informal conference with the DOL on February 4, 2015 to resolve the penalties. The board found that it first learned of these developments after the petitioner, on January 29, 2015, requested that the board grant her settlement authority in connection with the February 4 conference.

At the hearing, the petitioner testified that: (1) on October 23, 2014, she told her liaison on the board, Commissioner Katharin Pratt, that she was going to meet with the DOL on October 31 to receive the report; (2) on October 29, 2014, she advised the board of the October 31 meeting, asked whether anyone wanted to attend, and was informed that no commissioner would attend; (3) after she received the report, she notified Pratt; (4) on November 5, 2014, she advised the board that the report was confidential and that if it accepted it, the report would become public; (5) the board decided not to accept the report; (6) on or about December 11, 2014, she received the DOL's December 5, 2014 correspondence and notified Pratt; (7) on December 23, 2014, she notified Pratt that the DOL had scheduled the February 4, 2015 hearing ; (8) on December 31, 2014, Tombarello was in the petitioner's office with Pratt, saw the report, and asked what it was, to which she responded, "Well, that's the DOL report. Remember, the one that we decided not to accept?"; and (9) on January 29, 2015, she learned that she would need settlement authority at the February 4 meeting, and advised the board. Pratt, who was no longer a commissioner as of January 6 or 7, 2015, generally corroborated the petitioner's testimony concerning their communications, the petitioner's communications to the board on October 29, and November 5, 2014, and the December 31 meeting with Tombarello.

In contrast to the testimony of the petitioner and Pratt, Coyle testified that he first learned of the report, that the DOL was seeking to assess a $17,900 fine, and that the February 4, 2015 hearing had been scheduled with the DOL, only when the petitioner requested settlement authority in late January 2015. Coyle testified that he found it "very disconcerting" to learn that the DOL was assessing a fine in excess of $17,000 because the DOL "just doesn't make a telephone call and say, Hey, you owe $17,000. There's got to be some kind of document that assesses a $17,000 fine." At that point, Coyle testified that he called the county's

4

legal counsel and learned that the DOL had in fact issued its report. According to Coyle, he attended the November 5, 2014 board meeting. He contested the assertion of the petitioner and Pratt that the board voted at that meeting not to receive the DOL report so as to maintain its confidentiality, explaining:

> I believe if there was a report and I had known about a report, I would have wanted to have seen it. Because I want to know – you know, I'm not afraid of documents being made public. If there's a report we did something wrong, then everybody should know. And that's always been my philosophy.
>
> If there had been a report, I would have wanted to see it. I would not have . . . wanted to be held in the dark on it.

In addition to the testimony, the committee had before it the meeting minutes from October 29, and November 5, 2014. Although the minutes from the October 29 meeting, which Coyle did not attend, reflect that the petitioner "provided an update on the DOL audit," the minutes provide no information concerning the substance of the "update." With respect to the November 5 meeting, the minutes are silent as to any discussion concerning the DOL audit.

The committee also had before it e-mails that the petitioner exchanged with Tombarello in early February 2015 after she had learned that the board was "entirely unhappy" with her concerning the DOL audit. In her e-mail to Tombarello, the petitioner purported to remind him of informal conversations they had shared concerning the DOL audit over the course of it, that at one point, the DOL had used his office, and that one of their informal conversations concerned her disappointment that the DOL report "included things we had shown were not an issue." Tombarello disputed that the petitioner had ever briefed him about such matters, and told her to "check [her] notes!" Nowhere in the e-mail exchange did the petitioner: (1) state that she had briefed the board on October 29, 2014 that she would be receiving the preliminary report; (2) claim that the board then voted on November 5, 2014 not to accept the report so as to maintain its confidentiality; or (3) assert that she had, prior to her request for settlement authority, advised any member of the board of the report, the fine assessment, or the February 4, 2015 DOL conference.

On appeal, the petitioner argues that the committee's approval of her paid suspension based upon her failure to timely apprise the board of information concerning the DOL audit is unjust, unlawful, and unreasonable because she "followed the [board's] liaison policy, which was the official way that she was instructed to bring information to the Board," by routinely notifying Pratt of such matters. However, whether the petitioner in fact timely advised Pratt of the relevant developments turns upon the credibility of the petitioner and Pratt. See Bloomfield, 166 N.H. at 479.

The record contains no contemporaneous documents establishing that the petitioner in fact notified any member of the board of the DOL report, the fine assessment, or the February 4, 2015 DOL informal conference at any time prior to January 29, 2015.  Moreover, despite the petitioner's testimony that the board voted not to accept the DOL preliminary report on November 5, 2014, the minutes from that meeting are silent as to the DOL audit, and Coyle unequivocally testified that he would not have voted not to accept the report.  Finally, at no point in her e-mail exchange with Tombarello did the petitioner assert that she had notified the board of these matters prior to requesting settlement authority in late January 2015.  Under these circumstances, we will not second-guess the committee's credibility determinations.  See id.  We conclude that competent evidence in the record reasonably supports findings that the petitioner engaged in neglect of duty and lack of cooperation for purposes of RSA 28:10-a, II, by failing to timely notify the board of important information concerning the DOL audit.

Finally, we address whether the committee erroneously applied the "good cause" standard of RSA 28:10-a, III.  The petitioner asserts that this court has never construed "good cause," which the statute does not define, within the context of RSA 28:10-a, and that our review of the committee's interpretation of "good cause" is de novo.  The petitioner does not, however, argue that the committee applied an erroneous interpretation of "good cause" in upholding her suspension.  Instead, she assumes the accuracy of the construction of "good cause" advocated by the board – that it means a legally sufficient reason for the suspension as articulated in the suspension letter – and argues that "because the record fails to support any conduct which amounts to neglect of duty, failure to cooperate and willful insubordination," the committee erred in applying that standard.  Because we have concluded that the record in fact contains competent evidence supporting findings that the petitioner engaged in neglect of duty, willful insubordination, and lack of cooperation for the reasons articulated by the board in its suspension letter, we reject this argument.

Affirmed.

Dalianis, C.J., and Hicks, Conboy, Lynn, and Bassett, JJ., concurred.

**Eileen Fox,
Clerk**

6